Filed 2/15/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re L.R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. L.R., Defendant and Appellant. | A154437 (Contra Costa County Super. Ct. No. J18-00221) |

Minor L.R. appeals following the juvenile court's disposition order, arguing the juvenile court erred in denying his motion to suppress and in the imposition of a commitment term. Specifically, the court committed Minor to juvenile hall until age 21, but provided for an earlier release if and when he successfully completed a court-designated treatment program. We affirm the commitment and reject the argument that its imposition "impermissibly [d]elegated [the court's] authority to the probation department to determine the length of the commitment." We remand for the juvenile court to set an interim review hearing and otherwise affirm.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.

1

BACKGROUND

*San Francisco County Offense*

On December 3, 2017, in San Francisco County, a male took a woman's cellphone from her hand and passed it to Minor. Police saw the woman chasing Minor, apprehended him, and found the woman's phone in his pocket. Minor admitted to misdemeanor receiving stolen property (Pen. Code, § 496, subd. (a)), and the case was transferred to Contra Costa County (Minor's county of residence) for disposition.

*Alameda County Offense*

On February 13, 2018, in Alameda County, Minor and another male robbed two victims, whom Minor later characterized as "little kids," using a weapon Minor described as a pellet "replica" gun. Minor was apprehended at the scene and confessed to the robbery. A search of Minor's cellphone revealed an email receipt for a "Semi-Auto BB Air Pistol." Minor admitted to attempted second degree robbery (Pen. Code, §§ 211, 664), and the case was transferred to Contra Costa County for disposition.

*Contra Costa County Offense*

In Contra Costa County on February 12, 2018—the day before the Alameda County robbery—two males robbed a victim at gunpoint, taking his cellphone. After Minor was arrested for the Alameda County robbery, he also confessed to the Contra Costa robbery. Minor had the Contra Costa County victim's cellphone in his possession at the time of his Alameda County arrest.

A Welfare and Institutions Code[1] section 602 juvenile wardship petition alleged appellant committed second degree robbery (Pen. Code, § 211), and further alleged Minor personally used a dangerous or deadly weapon, to wit, a BB gun (Pen. Code, § 12022, subd. (b)(1)). Minor filed a motion to suppress his statements to police, arguing they were elicited in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Following an evidentiary hearing on both the motion to suppress and jurisdiction, the juvenile court denied the motion to suppress and sustained the allegations of the petition.

---

[1] All undesignated section references are to the Welfare and Institutions Code.

*Disposition*

In May 2018, the juvenile court issued a dispositional order on the three petitions. The juvenile court adjudged Minor a ward, removed him from parental custody, and committed him to a county institution to participate in and complete the Youthful Offender Treatment Program (YOTP).

DISCUSSION

I. *Motion to Suppress*

A. *Additional Background*

Minor's father testified Minor was 16 years old, had an individualized education program (IEP) at school, and had had an IEP since kindergarten.[2] Minor's school placed him in rooms with fewer students to help him learn. Sometimes Minor did not understand things his father told him or forgot them later on.

Officer Justin Kurland testified about his interview with Minor following Minor's Alameda County arrest. A videotape of the interview was admitted into evidence and reviewed by the juvenile court in chambers, along with a transcript provided by Minor. At the beginning of the interview, Officer Kurland read Minor the *Miranda* warnings from a printed card. After each warning, Officer Kurland asked Minor if he understood, and Minor nodded his head or answered affirmatively. Following the *Miranda* warnings, Officer Kurland asked, "So with those rights in mind, I want to talk to you and find out what's going on. Is that okay with you?" Minor nodded his head. After confessing to the Alameda and Contra Costa offenses, Officer Kurland asked Minor if he could "write down everything we talked about." Minor responded, "I don't know. Because I have a short-term memory. I forgot what we just talked about." Officer Kurland proceeded to ask Minor numerous questions about the robberies, which Minor answered, and Officer Kurland wrote a statement based on Minor's answers.

---

[2] "An IEP is a comprehensive statement of a disabled child's educational needs and the specifically designated instruction and related services that will meet those needs." (*In re I.V.* (2017) 11 Cal.App.5th 249, 253, fn. 4.)

3

In a lengthy ruling from the bench, the juvenile court denied Minor's motion to suppress. The court reasoned that, having "watched the video very carefully[,] . . . I don't find that the officer very quickly or in a rushed way went through the *Miranda* advisements. He asked after each one: 'Do you understand?' And [Minor] either said 'yeah' or 'yes' or nodded." Moreover, Minor "appears to not have any difficulty communicating with the officer [or] understanding the questions," and "was not unsophisticated," having "been arrested for a similar offense in San Francisco just two months before and had been in police custody . . . . So we know that this is not his first experience with law enforcement." With respect to Minor's IEP, "there are all kinds of reasons that kids can have IEPs. And without information about what that is, I don't have any reason to believe that the understanding that I saw on the videotape with respect to every question asked is somehow undercut by the fact that he has had some special education services." As for Minor's refusal to write down his statement, "[i]t was more a limitation of his willingness to cooperate than a genuine explanation that he was unable to recall. . . . He recalled everything that happened the day before. I don't believe that it was a genuine statement that he had short-term memory problems. He was making an excuse." The court concluded, "in the totality of the circumstances, the People have carried their burden that this was a knowing and voluntary waiver."

B. *Analysis*

"The prosecution has the burden of establishing, by a preponderance of the evidence, the voluntariness of an accused person's waiver of his *Miranda* rights. [Citation.] The waiver of *Miranda* rights must be voluntary in the sense that it was the product of a free and deliberate choice, and was made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. [Citation.] . . . [¶] To determine whether a juvenile's waiver of his *Miranda* rights is voluntary, a court should consider the totality of the circumstances, including the minor's 'age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' [Citation.] When a confession by a

4

minor is involved and 'counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary . . . .' [Citation.] On review, the appellate court defers to the trial court's factual findings if they are supported by substantial evidence but reviews de novo the ultimate question of whether a waiver was voluntary." (*In re T.F.* (2017) 16 Cal.App.5th 202, 210–211.)

Minor points to Officer Kurland's preface, before reading Minor his rights, that "I'm going to read you your rights, *real quick*; okay?" (Italics added.) Minor contends the officer thus "minimized the importance of these rights," citing *In re T.F., supra,* 16 Cal.App.5th 202. In *In re T.F.,* the Court of Appeal noted the officer "rapidly rattled off the *Miranda* admonition without taking time to determine whether T.F. understood all of his rights." (*Id.* at p. 211.) However, this was not the focus of the Court of Appeal's concern. Instead, the court concluded events before and after the admonitions demonstrated the minor was "cajoled or tricked": "[Officer] Hewitt informed T.F. of his *Miranda* rights after the youth had already undergone a nearly hour-long interrogation by two police detectives while confined in a school conference room, which culminated in his arrest. T.F. was sobbing and clearly distraught at school and remained so during the subsequent interrogation. Then, once at the station, before giving the *Miranda* warning, Hewitt told T.F., 'I'm gonna read these to you *before we talk, okay*?' (Italics added.) By this statement, Hewitt stated as a fact that T.F. would talk to him. This statement followed by the immediate recitation of rights, which included the right to remain silent, was contradictory and confusing. [¶] Then, after telling T.F. they were going to 'talk' and quickly dispensing the *Miranda* warning, Hewitt immediately launched into questioning T.F. about an unrelated outstanding warrant. From listening to the recorded interview, it is clear that T.F. was confused about the warrant. Hewitt asked T.F. several questions about the warrant before telling T.F., 'let's forget about the warrant for right now . . . That doesn't really have anything to do with this case. I was just curious if you remembered.' After befuddling T.F. by mixing up the *Miranda* rights with the warrant, Hewitt smoothly transitioned to questioning T.F., referring him 'back to what we were

talking about up at the school.' " (*Id.* at pp. 211–212.) No comparable events took place in the case before us, and *In re T.F.* is thus readily distinguishable. Moreover, despite Officer Kurland's prefatory remark, the juvenile court explicitly found the officer's actual reading of the advisements was *not* done "very quickly or in a rushed way," and Minor does not challenge this finding.

Minor's additional arguments are unavailing. Minor notes that, although the printed *Miranda* card used by Officer Kurland included places to indicate whether the suspect understood each right and wanted to speak to the officer, these were all left blank on Minor's card. Minor cites no authority that written responses to *Miranda* warnings are required to find a voluntary and knowing waiver.[3] Similarly, Minor argues Officer Kurland did not explicitly ask, " 'Do you waive these rights?' " But Minor cites no authority that Officer Kurland's phrasing—"So with those rights in mind, I want to talk to you and find out what's going on. Is that okay with you?"—is insufficient. (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1269 [" '[n]o particular manner or form of *Miranda* waiver is required' "].) Finally, Minor contends Officer Kurland only orally advised him without showing him the written form, highlights his comment about "short-term memory," and points to his IEP. The trial court found Minor did not have difficulty understanding the officer's oral statements and questions, rejected the "short-term memory" statement as "an excuse," and found Minor's IEP alone—absent evidence about the disability giving rise to the IEP—did not undermine other evidence that Minor understood the admonitions. Substantial evidence supports these findings.

We conclude the juvenile court did not err in denying Minor's suppression motion.

II. *Commitment Term*

A. *Background*

At the disposition hearing, the juvenile court expressed concern about the "serious, dangerous series of incidents . . . , the use of a weapon, even if it is a BB gun, the

---

[3] That the *Miranda* card for Minor's co-responsible was filled out and the co-responsible did not make a statement, as Minor emphasizes, does not compel a finding that Minor's waiver was invalid.

6

increasing severity and victimization of people, including young kids, and having absolutely no empathy apparently or sense that he would not do it again.[4] I think that the intensive programming that's available to him here at YOTP is the most appropriate." The court committed Minor to a county institution for a period not to exceed the maximum custody time of seven years (less custody credits) or until he turns 21, whichever comes first, and to participate in and "successfully complete all phases of" YOTP. The court's comments and orders clearly contemplate that Minor will be released early if he successfully completes YOTP, and the parties so assume.

Minor's counsel objected "to the YOTP order with the unlimited [term]," arguing it violated "due process to order someone into a long-term program and not specifying how many days for the record." The juvenile court overruled the objection: "The YOTP program has specific modules. It has specific phases that have to be completed and classes that have to be taken. I understand the objection, but I don't think that it rises to the level of a due process issue."

The Contra Costa County Probation Department provides the following description of YOTP: "YOTP is a self-contained, phased, behavioral treatment unit in Juvenile Hall for 30 residents, with enriched staffing that includes a mental health specialist, teacher, and three deputy probation officers in addition to counseling staff, who work together running groups and reviewing the residents' progress to see if they are ready to move forward to the next phase. The program is cognitively based and requires the young men to work their way through and out of the program. . . . Custodial time is significant; sentencing to the maximum confinement time or age 21, whichever comes first. The phased program addresses a common institutional problem of residents not participating and 'waiting out their time.' [¶] Once a youth achieves his last phase and the

---

[4] Minor told Officer Kurland he did not feel bad about the robberies, did not see anything wrong with them, and did not know whether he would commit more robberies in the future.

court determines a release date, based upon his performance in the program, the resident, staff and his family, begin to work on his transition plan to the community."[5]

B. *Analysis*

When a minor is "committed to the care, custody, and control of the probation officer, the court may make any and all reasonable orders for the conduct of the ward . . . . The court may impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced." (§ 730, subd. (b).) "The statutory scheme governing juvenile delinquency is designed to give the court 'maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' [Citation.] Flexibility is the hallmark of juvenile court law, in both delinquency and dependency interventions. [Citation.] As noted, the juvenile court has long enjoyed great discretion in the disposition of juvenile matters . . . ." (*In re Greg F.* (2012) 55 Cal.4th 393, 411.)

Minor argues the juvenile court "impermissibly [d]elegated its authority to the probation department to determine the length of the commitment," violating constitutional separation of powers and due process provisions. However, as the People argue, the YOTP program description states that "the court determines a release date, based upon [the minor's] performance in the program . . . ." Thus, the program description contemplates the juvenile court retains the authority to determine the length of Minor's commitment. Nothing in the record suggests the juvenile court delegated this authority.

This retention of authority is also supported by *In re Robert M.* (2013) 215 Cal.App.4th 1178, cited by the People. In that case, the juvenile court ordered the minor committed to juvenile hall until age 21. (*Id.* at p. 1182.) Although committed to juvenile hall, the minor was to be housed at the Division of Juvenile Facilities (DJF) pursuant to

---

[5] We grant the People's unopposed request for judicial notice of the website containing this description.

section 1752.16,[6] and the court ordered the minor " 'to complete sex offender counseling at the Division of Juvenile Facilities . . . . And upon completion of that sex offender counseling, he is to be returned to the Stanislaus County Juvenile Court for possible modification of his sentence.' " (*Ibid.*) The minor argued the order "impermissibly intermingles the responsibilities of the probation department and the responsibilities of DJF." (*Id.* at p. 1185.) The Court of Appeal rejected the challenge: "It is clear from the statutory scheme . . . that the juvenile court retains supervision and control over a minor. That supervision and control is not altered by the minor's participation in the DJF sexual offender program. Unquestionably, a ward placed in a foster home, a residential treatment program, or juvenile hall (or an older ward housed in the county jail under § 208.5) is answerable on a daily basis to those who operate the program, but that does not change the ultimate responsibility of the juvenile court for the ward's supervision and control. . . . The juvenile court clearly ordered that minor 'successful[ly] complet[e]' DJF's sexual offender program. The court clearly has the retained jurisdiction to determine whether minor has done so." (*Ibid.*) Minor makes no attempt to distinguish *In re Robert M.* Although the case addressed a slightly different argument, its reasoning applies here. The juvenile court retains the authority to determine whether and when Minor has successfully completed YOTP.

Minor argues that, nonetheless, Minor "might not be able to pass the phases of the program that would bring him to its final phase," perhaps because of the disability giving rise to his IEP, and argues a progress report and noticed hearing should be scheduled one year after his commitment to YOTP. The juvenile court did not schedule a review hearing at disposition, and we agree with Minor that an interim review hearing is appropriate in light of the lengthy maximum commitment term and the juvenile court's

---

[6] Section 1752.16 was enacted in response to a California Supreme Court case limiting the offenses for which a minor could be committed to DJF, authorizing such arrangements for wards who were in the custody of DJF when the case was decided. (See *In re Robert M., supra,* 215 Cal.App.4th at pp. 1181–1182.) The challenged disposition order in *In re Robert M.* issued on remand following the California Supreme Court case. (*Id.* at p. 1182.)

supervisory role. We will remand for the juvenile court to set an interim review date at or before one year following Minor's commitment to YOTP, if one has not already been scheduled or held.

If, prior to this interim review, Minor disagrees with the probation officer's assessment of his performance in YOTP or believes a disability prevents his successful completion of earlier phases of the program, he (or his parents or attorney) can file a section 778 petition requesting the juvenile court modify the disposition order. (§ 778, subd. (a)(1) ["[a]ny parent or other person having an interest in a child who is a ward of the juvenile court or the child himself or herself through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a ward of the juvenile court for a hearing to change, modify, or set aside any order of court"]; Cal. Rules of Court, rule 5.60(e)(1) [§ 778 petition can be filed by, inter alia, parent, child, or child's attorney].) Minor challenges the availability of this procedure because Minor, "while being in a locked facility, would not likely have the knowledge that his sentence is being unduly prolonged and even if he did it is doubtful that a longer sentence would be considered a 'change of circumstance or new evidence.' " There are 30 residents at a time in YOTP. Minor will be well aware if his peers are progressing through the phases at a substantially faster rate than he is. If he disputes the probation officer's assessment of his progress or believes a disability prevents his successful completion of the program, either event would appear to constitute a changed circumstance from the implicit assumptions in the dispositional order that the probation officer will fairly assess Minor's performance and that Minor is capable of successfully completing YOTP. (See *In re I.V., supra,* 11 Cal.App.5th at p. 259 [rejecting argument that the juvenile court failed to sufficiently consider the special education needs of the minor when ordering him to complete a treatment program, and noting the minor "remained free to revisit the [treatment program] condition through an appropriate petition for modification. (§ 778.)"].)

In sum, the order commits Minor to juvenile hall until age 21, but provides he will be released earlier if he successfully completes YOTP. Under the statutory scheme and

the YOTP program description, the juvenile court retains the authority to determine whether and when Minor successfully completes YOTP and, therefore, whether and when he will be released early from juvenile hall. On remand, the juvenile court will set an interim review hearing to monitor Minor's progress at or prior to one year following his commitment. Moreover, if Minor believes his ability to progress through the program is unreasonably impeded by the probation officer, a disability, or any other factor, he may file a section 778 petition to bring the issue before the juvenile court. The commitment does not violate constitutional separation of powers or due process principles.

## DISPOSITION

The matter is remanded with direction to the juvenile court to set an interim review hearing at or before one year following Minor's commitment, if such a hearing has not already been scheduled or held. In all other respects, the judgment is affirmed.

11

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

(A154437)

12

Superior Court of Contra Costa County, No. J18-00221, Hon. Leslie Landau, Judge.

Sibyl Day, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Eric D. Share and Andrew Hamilton Smith, Deputy Attorneys General, for Plaintiff and Respondent.